DWC/KBP 35-182
5/22/06 294339

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

DENISE CROWE
Plaintiff

VS. C.A. No: 05-098 T

ROBERT C. MARCHAND, M.D.,
Defendant

**DEFENDANT, ROBERT C. MARCHAND, M.D.'S PRETRIAL MEMORANDUM**

## A. PARTIES

Plaintiff, Denise Crowe, is a 42 year old left handed female. She is divorced and the mother of four children. She resides in Stafford, Kansas with three of her four children, namely Casey Waters (DOB 8/5/92), Sara Waters (DOB 8/6/93) and Jamie Waters (DOB 10/30/94). Her fourth child, Kala Hennessey (DOB 5/28/85) resides in Tampa, Florida. She is presently employed by Res-Care Pathways as a Community Living Trainer.

Defendant, Robert C. Marchand, M.D., is a board certified orthopedic surgeon. He is employed by South County Orthopedics & Physical Therapy, Inc. (hereinafter the "Practice").

## B. FACTS

This is a medical malpractice action wherein Plaintiff, Denise Crowe, alleges that Defendant was negligent in the diagnosis, care, and treatment of the injury she sustained to her right wrist while rollerblading on October 20, 2002, resulting in permanent injury and disability of her wrist. On October 20, 2002, Ms. Crowe presented to South County Memorial Hospital where x-rays were taken and she was diagnosed with a right radial fracture. Ms. Crowe first presented to Dr. Marchand on October 21, 2002. X-rays on that date showed a non-displaced

distal radius fracture. Dr. Marchand placed Ms. Crowe in a volar splint and asked her to return in 2 ½ weeks.

Ms. Crowe presented on November 5, 2002, with complaints of swelling and popping in her wrist. A physician's assistant employed by the Practice, Rick Moffitt examined Ms. Crowe and reported that there was some widening of the scapholunate, which he would discuss with Dr. Marchand. Mr. Moffitt recommended ice, elevation and immobilization as well as gentle range of motion exercises. Although it had not reached a diagnostic stage, Dr. Marchand began considering the possibility of Reflex Sympathetic Dystrophy (RSD) developing on November 5, 2004. Dr. Marchand next saw Ms. Crowe on November 14, 2002, at which time x-rays showed a widening of the scapholunate ligament and a triangular fibrocartilage tear. Although the option of reconstruction of the ligament was discussed with Ms. Crowe at that time, Dr. Marchand opted to treat Ms. Crowe conservatively with a splint and physical therapy, and asked Ms. Crowe to return in 4 weeks.

On December 3, 2002, Ms. Crowe's occupational therapist at the Practice noted significant edema, increased pain and continued concern about RSD. On December 26, 2002, approximately two months post-injury, Ms. Crowe was again seen by Physician's Assistant Moffitt. There was continued concern of RSD, and occupational/physical therapy was increased to 3 times per week. The plan at that time was to treat Ms. Crowe with anti-inflammatories, Motrin and Elavil, and for her to return in 3 weeks unless she had a problem.

On January 7, 2003, Ms. Crowe reported to her therapist at the Practice that she was "very swollen today" because she "bumped it yesterday." On January 16, 2003, Dr. Marchand examined Ms. Crowe. At that time Ms. Crowe had significant discomfort with range of motion and significant skin atrophic changes. Dr. Marchand's impression at that time was that she had right radius injury and scapholunate ligament injury with RSD. His plan was to continue

therapy, increase Elavil, and for her to return in 4 weeks. Ms. Crowe reported to her therapist that same day that she was frustrated because Dr. Marchand was discouraged by the slow progress and that "I am trying."

On January 30, 2003, Ms. Crowe's therapist at the Practice noted less stiffness and better mobility. On February 11, 2003, Ms. Crowe's therapist at the Practice noted her wrist movement was slowly improving but that she had shoulder stiffness. On February 25, 2003, Ms. Crowe's therapist at the Practice noted increased pain and stiffness, limiting activity.

On February 26, 2003, Ms. Crowe saw Dr. Marchand. Although her hand was better at that time, she was having dysfunction of her right shoulder and elbow. Ms. Crowe had stopped taking Elavil, which had been helping. Interscalene blocks were discussed with Ms. Crowe to decrease some symptomatology, and Ms. Crowe wanted to think about it. This is the last time Dr. Marchand examined Ms. Crowe. On February 27, 2003, Ms. Crowe reported to her therapist at the Practice that the doctor wanted to try interscalene blocks. On March 13, 2003, Ms. Crowe reported to her therapist at the Practice that her hand/forearm became red/purple today with increased pain. The therapist noted that Ms. Crowe had more RSD symptoms evident during this session. On April 11, 2003 Ms. Crowe saw Dr. Burns, who also practices at the Practice, with complaints of persistent symptoms and marked limitation in motion of the wrist. Dr. Burns referred Ms. Crowe for a surgical consultation regarding ligamentous reconstruction.

Ms. Crowe saw Dr. Akelman at Rhode Island Hospital on April 24, 2003, at which time he referred her for physical therapy for her shoulder and scheduled surgery for May 13. After surgical repair of her wrist, Plaintiff underwent occupational therapy at Rhode Island Hospital from August 20, 2003 through January 2004. Plaintiff testified at her deposition of December 16, 2005 that the occupational therapy sessions reduced the pain in her wrist, reduced the

swelling, and improved her ability to move her fingers. (Crowe dep. at p. 104, 8 – p. 105, 1.7.)[1] Plaintiff obtained a new prescription for additional therapy on November 6, 2003, but did not resume occupational therapy until December 29, 2003. (Crowe dep. at p. 108, 4-10; p. 112, 1.4-10.) Plaintiff testified that she canceled her therapy session on January 30, 2004 because her children had head lice. (Crowe dep. at p. 113, 7-13.) Ms. Crowe further testified that she stopped going to therapy after January 26, 2004 because of her children's head lice, which took months to remove. (Crowe dep. at p. 113, 18-20; p. 116, 14-23.) Ms. Crowe further stated that she did not explore other options with respect to physical therapy because she did not want to go to any physical therapy anymore. (Crowe dep. at p. 122, 20-24.)

Ms. Crowe asserted that she suffered a loss of earning capacity and that she was out of work from May 13, 2003 through September 8, 2003. She calculates her lost earnings to be $5,525 ($11.23 / hr x 29 hours/week = $325; $325 x 17 weeks = $5,525). (Plaintiff's Answers to Interrogatories propounded by South County Orthopedics, No. 5). However, during this time, Ms. Crowe collected TDI in the amount of $4,871. (Plaintiff's Responses to Requests for Production of Documents Propounded by Defendant, South County Orthopedics & Physical Therapy, Inc., No. 1). Ms. Crowe has also identified charges for medical services totaling $7,384 (Plaintiff's Answers to Interrogatories Exhibit A; Plaintiff's Responses to Requests for Production of Documents, No. 1). Ms. Crowe also testified that all of the medical services she received from South County Orthopedics and Physical Therapy, Dr. Akelman and Rhode Island Hospital were paid for by Neighborhood Health Plan. (Crowe dep. at p. 16, 1-20.)

[1] Pursuant to the Pretrial Order-Jury Case, section 5, applicable to pretrial motions before Chief Ernest C. Torres, the cited portions of the depositions are not attached as exhibits as the Defendant does not anticipate the contents of those transcripts to be disputed. To the extent that the Plaintiff disputes the cited provisions, and/or to the extent the Court requests, Defendant will submit copies of the relevant provisions of the deposition transcripts.

## C. CLAIMS AND DEFENSES

1. **Defendant did not breach the duty of care owed to Plaintiff as he met the required standard of care.**

2. **Defendant was not negligent in his treatment of Plaintiff.**

3. **Assumption of the Risk**

4. **Contributory and Comparative Negligence**

5. **Defense as to Damages Collateral Source in Medical Malpractice Actions**

## D. ISSUES

The Court has addressed via its July 5, 2006 Order Denying Defendant's Motion in Limine, the Defendant's contention that certain testimony of Dr. Rozmaryn should be excluded. The Defendant is not aware of any other outstanding legal issues.

## E. ARGUMENTS

### 1. Defendant did not breach the duty owed to Plaintiff.

Under Rhode Island law, physicians are under duty to use degree of care and skill that is expected of a reasonably competent practitioner in same class to which he or she belongs, acting in same or similar circumstances. Gautieri v. U.S., 167 F.Supp.2d 207 (D.R.I. 2001). See also Sheeley v. Memorial Hosp., 710 A.2d 161, 167 (R.I. 1998). Under Rhode Island law, a physician is not under duty to cure a patient, nor does a physician guarantee a successful course of treatment. Guatieri supra. See also Schenck v. Roger Williams Gen. Hospital, 382 A.2d 514, 517 (R.I. 1977); Young v. Park, 417 A.2d 889, 893 (R.I. 1980). Hence, Dr. Marchand was under a duty to use that degree of care and skill that is expected of a reasonably competent orthopedic. In the case at bar, it will be clear from the evidence provided, that one day after Ms. Crowe suffered her initial injury, she presented to Dr.

Marchand, who evaluated her and began a course of treatment. Approximately 2 weeks after her initial injury, Ms. Crowe began to experience symptoms inconsistent with her injury, which caused Dr. Marchand to consider that Ms. Crowe was developing RSD. As Ms. Crowe's RSD symptoms progressed, Dr. Marchand implemented an aggressive treatment program to address the RSD and continued a conservative treatment plan for the wrist fracture and scapholunate ligament tear. Dr. Marchand's decision was within the standard of care required by the reasonable orthopedic surgeon in 2002.

Unless lack of care rendered by physician is so obvious as to be matter of common knowledge Rhode Island law requires that standard of care be established through expert testimony. Gautieri, supra; see Wilkinson v. Vesey, 295 A.2d 676, 682 (R.I. 1972). Under Rhode Island law, a physician's alleged deviation from applicable standard of care must be established through expert testimony. Gautieri, supra; see Wilkinson at 682. Expert testimony will establish that Dr. Marchand's selected course of treatment and care rendered was appropriate and within the standard of care.

**2. Defendant was not negligent in his treatment of Plaintiff.**

A plaintiff pursuing a medical malpractice claim under Rhode Island law must prove by preponderance of evidence that: (1) defendant had duty to act or to refrain from acting, (2) defendant breached that duty, and (3) defendant's breach proximately caused plaintiff's injuries. Guatieri at 207. See also Schenck, 382 A.2d at 516-17. Defendant Marchand did not breach the duty owed to Plaintiff. Further, earlier surgery to Ms. Crowe's torn ligament, which is the alleged deviation from the standard of care, would not have given Ms. Crowe a better result. Plaintiff is unable to prove by a preponderance of the evidence all of elements required to maintain a medical malpractice claim; hence, Plaintiff's claim must fail.

### 3. Assumption of the Risk

The affirmative defense of assumption of the risk requires the defendant show that the party who is alleged to have assumed the risk had actual knowledge of the precise risk before electing to encounter it. Owens v. Silvia, 838 A.2d 881 (R.I. 2003). In Owens, the court stated:

> Under the affirmative defense of assumption of the risk, it was incumbent upon members of operating room team to affirmatively prove, through expert testimony or other relevant evidence, that the precise injuries sustained by patient during jaw-reconstruction team fell within the risks set forth on the informed-consent form and were not caused by malpractice. Owens at 903, fn 15.

It is therefore incumbent upon the defendant to affirmatively prove, through expert testimony or other relevant evidence, that the precise injury sustained by the plaintiff fell within the risks set forth on the informed-consent form and were not caused by malpractice. Id.

In the case at bar, Ms. Crowe testified that therapy helped improve her condition by reducing pain, reducing swelling and improving finer mobility. (Crowe dep. at 104, 8-17.) Lynn Benevides, the Rhode Island Hospital occupational therapist who treated Ms. Crowe, testified that during the more than seven week break the Plaintiff took from her occupational therapy between November 6, 2003 and December 29, 2003, the Plaintiff's wrist flexion and wrist extension had decreased, her supination had decreased actively, and her grip strength had decreased. (Benevides dep. at p. 44, 8 – p. 45, 1.) Further, Ms. Crowe acknowledged that utilizing the equipment consistently is what improved her wrist. (Crowe dep. at p. 105 21-25.) Hence, Ms. Crowe was certainly aware that terminating her physical therapy and relying on home exercises as opposed

to the equipment, which admittedly helped her, placed the achievement of maximum medical improvement at risk.

### 4. Contributory and Comparative Negligence

The facts set forth herein support Defendant's claim that plaintiff was contributorily negligent. "In all actions hereafter brought for personal injuries…the fact that the person injured… may not have been in the exercise of due care shall not bar a recovery, but damages shall be diminished by the finder of facts in proportion to the amount of negligence attributable to the person injured[.]" R.I. Gen. Laws §9-20-4. Contributory or comparative negligence "comes into play only after negligence is first established on the part of both the plaintiff and the defendant. Once that is established, the plaintiff's damages 'shall be diminished by the finder of fact in proportion to the amount of negligence attributable' to the plaintiff." Calise v. Hidden Valley Condominium Association, Inc., 773 A.2d 834, 837 (R.I. 2001). By taking more than seven weeks off from her therapy and then failing to continue and complete her occupational therapy treatments, the Plaintiff negligently worsened her condition and increased damages that would not have arisen had she continued with the prescribed occupational therapy. Notably, the Plaintiff knew that the occupational therapy helped her condition and, despite this, unilaterally canceled future appointments and quit the therapy.

After surgical repair of her wrist injury, Plaintiff underwent occupational therapy at Rhode Island Hospital from August, 2003 through January, 2004. Plaintiff testified at her deposition that the occupational therapy sessions reduced the pain in her wrist, reduced the swelling, and improved her ability to move her fingers. Plaintiff's occupational therapy stopped in lat October 2003 because Plaintiff was required to obtain a new prescription for the occupational therapy. Plaintiff did obtain the new prescription on November 6, 2003, but did not resume occupational therapy until December 29, 2003.

Lynn Benevides, the Rhode Island Hospital occupational therapist who treated the Plaintiff, testified that during the more than seven week break the Plaintiff took from her occupational therapy between November 6, 2003 and December 29, 2003, the Plaintiff's wrist flexion and wrist extension had decreased, her supination had decreased actively, and her grip strength had decreased. (Benevides dep. at p. 44, 8 – p. 45, 1.) Ms. Benevides testified that the decreases in motion in the Plaintiff's wrist during the time between the end of the first batch of therapy and the beginning of the second batch of therapy was related to the lack of therapy. Ms. Benevides knew of no factor other than the lack of therapy during that period of time that caused a decrease in the functionality of the Plaintiff's wrist. Further, Ms. Benevides stressed that a consistent and high degree of effort in therapy is vitally important to obtain good result and improved motion. Additionally, Plaintiff's own expert, Dr. Rozmaryn agreed that Ms. Crowe's failure to complete the course of therapy ordered and recommended by Dr. Akelman and his colleagues, precluded her from reaching her maximum potential improvement. (Rozmaryn dep. at p. 78, 13-20.)

Despite the fact that the occupational therapy helped the Plaintiff, and the previous lapse in therapy made the Plaintiff's condition worse, the Plaintiff canceled her occupational therapy appointment scheduled on January 30, 2004. The Plaintiff never returned to occupational therapy, negatively impacting her recovery.

By taking more than seven weeks off from her therapy and then failing to continue and complete her occupational therapy treatments, the Plaintiff negligently worsened her condition and increased damages that would not have arisen had she continued with the prescribed occupational therapy. Moreover, the Plaintiff herself knew that the occupational therapy helped her condition, yet unilaterally canceled and quit the therapy.

**3. Doctrine of avoidable consequences or failure to mitigate damages**

The facts set for the above support the affirmative defense of the doctrine of avoidable consequences or the failure of Plaintiff to mitigate her damages. "The affirmative defense of mitigation of damages is often referred to as the 'doctrine of avoidable consequences.' The law in Rhode Island is well settled that a party claiming injury 'has a duty to exercise reasonable diligence and ordinary care in attempting to minimize its damages." McFarland v. Brier, 769 A.2d 605, 610 (R.I. 2001) (quoting Tomaino v. Concord Oil of Newport, Inc., 709 A.2d 1016, 1026 (R.I. 1998). The doctrine applies to "a party claiming injury that is due to breach of contract or tort[.]" Tomaino, 709 A.2d at 1026 (emphasis added). "This rule prevents the injured party from sitting silent while the damages accumulate." Id. The doctrine "requires a plaintiff to take all reasonable steps to mitigate damages *after* he or she has been tortiously injured. The classic example is, of course, the failure or refusal of a victim to seek or submit to medical attention after wrongfully harmed by a defendant." Swajian v. General Motors Corp., 559 A.2d 1041, 1046 (R.I. 1989) (emphasis added and in original). By failing to participate in her scheduled and prescribed occupational therapy, when the therapy was helping her wrist to heal, the Plaintiff failed to mitigate her damages and, in fact, aggravated her alleged injuries.

After surgical repair of her wrist, the Plaintiff underwent occupational therapy at Rhode Island Hospital from August 2003 through January 2004. The Plaintiff testified at her deposition that her occupational therapy sessions reduced the pain in her wrist, reduced the swelling, and improved her ability to move her fingers. The Plaintiff's occupational therapy stopped in late October, 2003, because Plaintiff was required to obtain a new prescription for the occupational therapy. The Plaintiff did obtain the new prescription on November 6, 2003, but did not resume occupational therapy until December 29, 2003.

Lynn Benevides, the Rhode Island Hospital occupational therapist who treated the Plaintiff, testified that during the more than seven week break the Plaintiff took from, her occupational therapy between November 6, 2003 and December 29, 2003, the Plaintiff's wrist flexion and wrist extension had decreased, her supination had decreased actively, and her grip strength had decreased. Ms. Benevides testified that the decreases in motion in the Plaintiff's wrist during the time between the end of the first batch of therapy and the beginning og the second batch of therapy was related to the lack of therapy. Ms. Benevides knew of no factor other than the lack of therapy during that period of time that caused a decrease in the functionality of the Plaintiff's wrist. Further, Ms. Benevides stressed that a consistent and high degree of effort in therapy is vitally important to obtain good results and improved motion. Plaintiff's expert, Dr. Rozmaryn, agreed that Ms. Crowe's failure to complete the course of therapy ordered and recommended by Dr. Akelman and his colleagues, precluded her from reaching her maximum potential improvement. (Rozmaryn dep. at p. 78, 13-20.)

Despite the fact that the occupational therapy helped Plaintiff, and the previous lapse in therapy made the Plaintiff's condition worse, the Plaintiff canceled her occupational therapy appointment scheduled on January 30, 2004. The Plaintiff never returned to occupational therapy, negatively impacting her recovery. By failing to participate in her scheduled and prescribed occupational therapy, when the therapy was helping her wrist to heal, the Plaintiff failed to mitigate her damages, and in fact aggravated her alleged injuries.

**4. Defense as to Damages: Collateral Source Statute in Medical Malpractice Actions**

As an exception to the common law rule regarding sources of collateral payment to an injured party, Rhode Island General Laws, § 9-19-34.1 ("Collateral source rule in medical malpractice actions"), provides in relevant part:

> In the event the defendant so elects, in a legal action based upon a cause of action . . . for personal injury against a licensed physician . . . based upon professional negligence, the defendant may introduce evidence of any amount payable as a benefit to the plaintiff as a result of the personal injury pursuant to . . . any health, sickness or income disability insurance, *accident insurance that provides health benefits or income disability coverage*, and any contract or agreement of any group, organization, partnership, or corporation to provide, pay for, or reimburse the cost of medical, hospital, dental, or other health care services.

(emphasis added). Here, the source of Plaintiff's recovery, Temporary Disability Insurance (TDI), constitutes "any health, sickness or income disability insurance.." Additionally, all of Plaintiff's medical expenses were paid for through Neighborhood Health and therefore, constitute "any health, sickness or income disability insurance." Consequently, Ms. Crowe's TDI and medical insurance coverage are subject to the provisions of § 9-19-34.1.

Statutes pursuing the same general objective as § 9-19-34.1 are included within medical malpractice acts adopted by the overwhelming majority of our sister states. They are referred to as "collateral source statutes" because of their common objective of reducing the damages recoverable by tort victims from health care providers by the amount the tort victim realizes from collateral sources, with the result that a double recovery by the tort victim is avoided. These statutes abrogate the common-law collateral source rule that prevails in the great majority of the states, to-wit: that benefits received by a plaintiff from a source wholly independent of and collateral to the tortfeasor, as a result of the injury inflicted, will not diminish the damages otherwise recoverable from the defendant. See 22 Am.Jur.2d Damages, § 393, 763 (2005).

Statutes in derogation of common law must be strictly construed. Hodge v. Osteopathic Gen. Hosp. Of R.I., 265 A.2d 733, 738-39. (R.I. 1970). As to matters of statutory construction, "when the language of a statute is clear and unambiguous, this Court must interpret the statute

literally and must give the words of the statute their plain and ordinary meanings." Providence & Worcester Railroad Co. v. Pine, 729 A.2d 202, 208 (R.I. 1999). Based upon the plain and ordinary meanings of the words within the statute, § 9-19-34.1 applies to the Plaintiff's TDI recovery and benefits received from Neighborhood Health.

**F. PENDING MATTERS**

**1. Re-Deposition of Dr. Edward Nalebuff**

The re-deposition of Defendant's expert, Dr. Edward Nalebuff, limited to the issue of mitigation of damages, has been scheduled for November 14, 2006 at 4:00 p.m.

**G. ESTIMATED TIME OF TRIAL**

Approximately two weeks.

ROBERT C. MARCHAND, M.D.
By His Attorney,

/s/ David W. Carroll
/s/ Kristin Barkett Pettey

David W. Carroll #0561
Kristin Barkett Pettey #5926
ROBERTS, CARROLL, FELDSTEIN & PEIRCE INC.
Ten Weybosset Street, 8th Floor
Providence, RI 02903
401-521-7000

## CERTIFICATION

I hereby certify that on this 14th day of November, 2006 the within Pre-Trial Memorandum was filed electronically through the ECF System, where it is available for viewing and downloading and will be sent electronically to the counsel of record listed below who are registered participants identified on the Notice of Electronic Filing. The undersigned further certifies that a true copy of the within document was mailed, postage prepaid, to the following on the 14th day of November, 2006:

Thomas A. Tarro, III, Esq.
LAW FIRM OF THOMAS A. TARRO, III
The Summit East – Suite 330
300 Centerville Road
Warwick, RI 02886

/s/ Kristin Barkett Pettey