UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| DENISE CROWE | : | |
| VS. | : | C.A. No. 05-098T |
| ROBERT C. MARCHAND, MD; SOUTH COUNTY ORTHOPEDIC & PHYSICAL THERAPY, INC. | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER MOTION FOR NEW TRIAL**

Now comes your Plaintiff, Denise Crowe, pursuant to Rule 59 of the Federal Rules of Civil Procedure and moves for a new trial on the grounds that the trial court committed error in permitting certain expert opinions from the Defendant's medical expert, Dr. Bruce Leslie, at the trial. More specifically, the Plaintiff submits that the trial court allowed certain expert opinion testimony from Dr. Leslie, which lacked sufficient reliable foundation, where Dr. Leslie did not review the x-ray films of the Plaintiff prior to his deposition and prior to preparation of his written expert report dated December 14, 2005. Despite the lack of sufficient reliable foundation for his opinions, Dr. Leslie was allowed to offer testimony which was purely speculative as to the Plaintiff's prognosis and condition.

**STANDARD OF REVIEW**

In a civil case, a District Court may set aside a jury's verdict and order a new trial where the verdict is so clearly against the weight of the evidence as to amount to manifest a miscarriage of justice. *Federico v. Order of St. Benedict*,

R.I. 64 F 3d 1, 5 (1st Cir. 1995); Dall v. Coffin, 970 F 2d 964, 969 (1st Cir. 1992); Wagenmann v. Adams, 829 F.2d 196, 200-01 (1st Cir. 1987); *See also* Fed. R. Civ. P. 59(a).

With regard to the Rule 702 standard of review, the trial court must determine whether an expert witness is qualified and has specialized knowledge that will "assist the trier of fact to understand the evidence and to determine a fact and issue." *Harrison v. Sear, Roebuck & Co.* 981, F.2d 25, 28 (1st Cir. 1992).

In the case of *Bogosian v. Mercedes Benz of North America, Inc.*, 104 F.3d 472 (1st Cir. 1997), the United States Court of Appeals for the First Circuit set forth the Rule 702 requirements and standard of review as follows:

> First, the court has broad discretionary powers in determining whether or not the proposed expert is qualified by "knowledge, skill, experience, training or education." Fed. R. Evid. 702; *see generally* *Richmond Steel, Inc. v. Puerto Rican Am. Ins. Co.*, 954 F.2d 19, 21 (1st Cir. 1992). Next, the court decides that the proposed subject matter of the expert opinion properly concerns "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702. Finally, the court performs a gatekeeping function to ascertain whether the testimony is helpful to the trier of fact. *i.e.* whether it rests on a reliable foundation and is relevant to the facts of the case. *See* *Vadala v. Teledyne Indus., Inc.*, 44 F.3d 36, 39 (1st Cir. 1995); *see also* *Daubert*, 509 U.S. at 591, 113 S. Ct. at 2795 (characterizing this consideration as one of "fit"). 104 F.3d at 476. (*Emphasis added*)

**ARGUMENT**

Plaintiff argues that the Defendant's medical expert, Dr. Bruce Leslie, was permitted to offer certain opinions at trial concerning the Plaintiff's prognosis and condition, which amount to pure speculation on his part, where the testimony was not based upon sufficient facts and data.

Along these lines, prior to the direct examination of Dr. Leslie in the Defendant's case in chief, Plaintiff's counsel objected and requested sidebar. At that time, Plaintiff's counsel moved to preclude Dr. Leslie's testimony at trial on the ground that he had not reviewed the x-rays dated October 20, 2002 and November 5, 2002 taken of the Plaintiff's wrist, prior to offering his expert opinion at his deposition and as set forth in his expert report, dated December 14, 2005. Accordingly, the doctor lacked sufficient facts to offer an expert opinion in accordance with the requirements with Rule 702 of the Federal Rules of Evidence. The trial court overruled the objection and permitted Dr. Leslie to testify before the jury.

For his part, and over the objection of Plaintiff's counsel, Dr. Leslie was permitted to offer expert opinions as to the following: (1) the injuries sustained by the Plaintiff (Trial tr. pp. 9-10); (2) whether the Defendant had adhered to the standard of care in treating the Plaintiff's fractured radius (Trial tr. p. 15); (3) his opinion as to what impact would have had on the Plaintiff's fracture, if surgery was performed by the Defendant on November 14, 2002 or shortly thereafter (Trial tr. pp. 16-17); (4) his opinion as to whether the Plaintiff would have been in a better position today if the Defendant had operated to repair the ligament injury shortly after November 14, 2002 (Trial tr. pp. 18-20); and (5) his opinion that the Plaintiff's pain experienced during the period of time from November 14, 2002 through May 13, 2003 was caused by RSD and not by the scapholunate ligament tear (Trial tr. p. 24).

On cross-examination, Dr. Leslie acknowledged that he never reviewed the x-rays of the Plaintiff's wrist taken on October 20, 2002 and November 5, 2002, prior to offering his expert opinion at his deposition and as further set forth in his written report (Trial tr. pp. 42, 48 and 63). He further conceded that widening of the scapholunate joint is a "cause of concern" (Trial tr. p. 45). However, he could offer no opinion as to whether the x-ray films showed a widening of the Plaintiff's scapholunate joint, stating, "I would need to look at the films to make that determination." (Trial tr. p. 42).

Moreover, despite the fact that it was not disclosed in his expert report, Dr. Leslie was permitted to offer speculative testimony as to what the Plaintiff's present condition would be, if surgery was performed on November 14, 2002 or shortly thereafter, as well as the cause of Plaintiff's pain during the time from November 14, 2002 through May 13, 2003:

Q: Now, Doctor, if we assume that Dr. Marchand had gone ahead and operated on the 14th –

A. Yes, sir.

Q. -- on the ligament –

A. Yes, sir.

Q. -- or shortly after the 14th, on the ligament, do you have an opinion as to what impact that would have had on the fracture?

A. Yes, I do.

MR. TARRO: Objection.
THE COURT: Overruled. Go ahead, Doctor.

A. In my opinion, based on the review of the records, there is no question that this is a woman who was not healing the way a normal extra-articular cartilage fracture should heal.

As I said, in two weeks, it should be clearly getting better, swelling should be going down, finger motion should be getting better.

And the records clearly show just the opposite. If anything, it was getting more swollen, there was edema, although the terms were not clearly enunciated in the record, I mean nobody really put in the initial records RSD, or dystrophy, when you look at the records in their entirety, there is no question this wrist was not going the usual way.

My opinion is that, if you operate on somebody in the fact of a developing dystrophy, which I do believe she was developing, and by that, I mean repair the ligament, and to repair the ligament, that means putting her in a cast for a minimum of two, possibly three months, not only would, in my opinion, in my judgment, that have been wrong, it would have made her fingers more stiff.

By that, I mean, instead of her fingers making a fist like this, they'd be like this. It would have made her worse. (Trial tr. pp. 16-17)

* * *

Q. Doctor, let's assume that Dr. Marchand had operated on the patient to address the issue of the ligament –

A. Yes.

Q. -- shortly after her visit of November 14, 2002, with Dr. Marchand. If we made that assumption that he had addressed that in an operative procedure at that time, do you have an opinion as to whether her hand would be better or worse than it is today.

Do you remember the question, Doctor?

THE WITNESS: I know where we're going here.

A. Yes, I do. Having treated a number of patients in this particular situation who are developing a dystrophy, Reflex Sympathetic Dystrophy, or have a full-blown dystrophy, as a general rule, you like not to operate on them because they generally will get worse.

The answer to your question is: If Dr. Marchand had some surgery to repair the ligament at about four to six weeks after the injury, when she was in the process of developing a dystrophy, I would be very, very, very concerned that, after that surgery – and understand she would need to be in a cast for two to three months, so here we have a woman who's not moving that well – at the end of two to three months, that hand would be very stiff and not that functional.

The second part of your questions was, in regards to Dr. Akelman's surgery, it would be worse if he had operated on it then than she is now. (Trial tr. pp. 19-20)

* * *

Q. Did you have an opinion as to the cause of the discomfort she was experiencing during the period of time from November 14th till May 13th of the following year?

MR. TARRO: Objection

THE COURT: Same grounds?

MR. TARRO: Same grounds, Your Honor.

THE COURT: Overruled. You may answer.

A. I'm not certain exactly what you mean by cause, sir.

Q. I would like to ask if you have an opinion as to whether the discomfort she was experiencing related, if at all, to the RSD or to the injury to the ligament.

MR. TARRO: Objection.

THE COURT: Sustained. You need a foundation for that.

Q. Do you have an opinion, Doctor, as to whether the discomfort she was experiencing that you've read about in the records, without telling us what your opinion is, do you have an opinion as to whether it related to the RSD, in whole or in part, or the ligament tear?

MR. TARRO: Objection.

THE COURT: Overruled. You may answer that yes or no, Doctor.

A. Yes, I have an opinion.

Q. Okay. Without telling us your opinion, could you tell us the factual foundation of your opinion.

MR. TARRO: Objection.

THE COURT: Overruled. You may answer.

A. Without giving you my opinion?

Q. Right, tell us the factual foundation.

A. You have a patient who is not progressing in the usual way for a standard wrist fracture. Instead of getting better, she's getting worse. By – I have to look at my notes here. Excuse me.

By six weeks, she was having edema, meaning swelling, on the back of the hand. If any you have had a bruise or anything like that, you know you will get swelling, but it should get better within a few days or within a few weeks.

By six weeks, she was still having swelling. And when they say pitting edema, putting edema means that when you push on the skin, it indents and stays indented. That's a lot of swelling. That's at six weeks.

At eight weeks, she was having – the therapist was describing hypersensitivity. Hypersensitivity generally means when you touch the hand, or if I were to lightly touch your hand, you should not have that much pain, that's hypersensitivity. That's painful sensation. That's totally abnormal.

And then by three months, the therapist was describing – and actually, she used the words, I believe, at this time, Reflex Sympathetic Dystrophy, or RSD.

It was clear in the medical records that something was getting worse. And at about that time, the shoulder started getting stiffer, and then Rick Moffitt, the PA, started her on Elavil.

Elavil is a drug that's routinely used for somebody who has a dystrophy, an RSD. Elavil is something that helps decrease pain, allows people to sleep. And I think you'll note that maybe around four months, she was put on Elavil. And then at the visit, when she was seen by Dr. Moffitt, he actually increased the Elavil.

This was a woman who, in the medical record, was clearly going the wrong way. And by the wrong way, I mean she was going towards a dystrophy and not getting better from a fracture.

Q. Based on the factual foundation that you've just articulated, Doctor, could you tell the jury, please, what your opinion is as to whether the discomfort she experienced – or the relationship, I should say, between the discomfort she experienced between three weeks following the fall, November 14th, and the operation by Dr. Akelman and the cause of that experience – of that discomfort? I'm sorry.

MR. TARRO: Objection

THE COURT: Overruled. You may answer.

A. Is this were I can say the RSD was the cause of the pain?

(Trial tr. pp. 21-24)

Plaintiff submits that the foregoing opinions of Dr. Leslie should not have been introduced at trial where: (1) they constituted pure speculation on his part, where he did not review the diagnostic films to make any determination as to the existence and severity of the scapholunate ligament tear in the Plaintiff's wrist;

and (2) the opinions concerning the condition of the Plaintiff's fracture, if surgery had been performed sooner, and the cause of the Plaintiff's pain and suffering was not properly disclosed in Dr. Leslie's expert report of December 14, 2006, nor in his deposition of the Defendant's Answer to the Expert Interrogatory.

Under Rule 702, the trial court, as gatekeeper, must determine whether expert testimony will assist the trier of fact and more particularly "whether it rests on a reliable foundation and is relevant to the facts of the case." *Bogosian v. Mercedes Benz of North America, Inc.* 104 F.3d at 476.

In permitting the opinions of Dr. Leslie concerning the Plaintiff's prognosis, condition and the source of her pain, the court failed in its gatekeeping function because Dr. Leslie's opinions are clearly the product of speculation having not reviewed the pertinent diagnostic films. Without review of the actual films, Dr. Leslie's opinions are not based on a reliable foundation. In this regard, Dr. Leslie conceded upon cross examination that a board certified orthopedic surgeon is better qualified to interpret x-ray films than a board certified radiologist. (Trial tr. pp. 41-42) Moreover, he acknowledged the importance of reviewing x-ray films in diagnosing Plaintiff's injury and formulating a plan of treatment. (Trial tr. p. 41) Without this information, Dr. Leslie does not have a proper and reliable foundation for his opinions, rendering them pure speculation. Despite this fact and over the objection of Plaintiff's counsel, the trial court permitted the testimony of Dr. Leslie to be heard by the jury.

**CONCLUSION**

Based on the foregoing, Plaintiff's Motion for a New Trial should be granted.

Plaintiff,
By and Through Her Attorney,

___/s/ Thomas A. Tarro, III___________

Thomas A. Tarro, III #2046
THE LAW FIRM OF THOMAS A. TARRO, III
The Summit East - Suite 330
300 Centerville Road
Warwick, Rhode Island 02886
(401) 737-7200
(401) 732-3362 (fax)

**CERTIFICATION**

I, the undersigned, hereby certify that I mailed a copy of the foregoing ***Memorandum of Law in Support of Motion for New Trial*** on the 28th day of December , 2006, to:

David Carroll, Esq.
ROBERTS CARROLL FELDSEIN & PEIRCE
10 Weybosset Street
Providence, RI 02903

____/s/ Andrea T. Nadeau___________