CAPITOL
COURT REPORTING
Court Reporting • Tape Transcription

Condensed Transcript of the Testimony of

# Bruce Leslie, M.D.

Taken on December 29, 2005

Denise Crowe v. Robert Marchand, M.D.

225 Reservoir Avenue, Providence, RI 02907 p: 401.453.1005 f: 401.453.1009
www.capitolcourtreporting.com

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

DENISE CROWE,
Plaintiff

vs.

ROBERT C. MARCHAND, M.D.,
SOUTH COUNTY ORTHOPEDIC &
PHYSICAL THERAPY, INC.,
Defendant

DEPOSITION of BRUCE M. LESLIE, M.D., a witness called by Counsel on behalf of the Plaintiff, pursuant to the Rules of the United States District Court Procedure, before Pauline L. Bailey, a Professional Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, at The Wyndham Hotel, 89 Broad Street, Boston, Massachusetts, on Thursday, December 29, 2005, commencing at 1:17 p.m.



APPEARANCES:

Thomas A. Tarro, III, Esq.
The Law Firm of Thomas A. Tarro, III
The Summit East, Suite 330
300 Centerville Road
Warwick, RI 02886
(401) 737-7200
REPRESENTING THE PLAINTIFF

Dennis T. Grieco, Esq.
Gidley, Sarli & Marusak
One Turks Head Place, Suite 900
Providence, RI 02903
(401) 274-6644
REPRESENTING SOUTH COUNTY ORTHOPEDIC
& PHYSICAL THERAPY, INC.



David Carroll, Esq.
Roberts, Carroll, Feldstein & Peirce
10 Waybosset Street
Providence, RI 02903
(401) 521-7000
REPRESENTING ROBERT C. MARCHAND, M.D.

ALSO PRESENT:

William White, Videographer
115 Phenix Avenue
Cranston, RI 02920



INDEX

| Witness | Direct | Cross |
|---|---|---|
| Bruce M. Leslie, M.D. | | |
| (By Mr. Tarro) | 5 | |
| (By Mr. Grieco) | | None |
| (By Mr. Carroll) | | None |

EXHIBITS

| Number | Description | Page |
|---|---|---|
| Exhibit No. 1 | Curriculum Vitae of Bruce M. Leslie | 6 |

Exhibit No. 2 Amended Notice of Taking Deposition 6

Exhibit No. 3 Letter to Attorney Tarro 6

Exhibit No. 4 Expert Disclosure of Robert Marchand, M.D. 6

Exhibit No. 5 Letter to David Carroll, Esq. 6

Exhibit No. 6 Invoice 6


*Indicates phonetic spelling



STIPULATIONS

It is hereby stipulated and agreed by and between Counsel for the respective parties that counsel for the Defendant will reserve the right for the Deponent shall to read and sign the deposition transcript.

*

BRUCE M. LESLIE, MD., first being duly sworn, on oath, was questioned and testified as follows:

*

PROCEEDINGS

(Whereupon the below-described documents were marked Plaintiff's Exhibit No.s 1-6.)

MR. WHITE: We're on the record. My name is William White. Today's date is December 29, 2005. We're in Boston, Massachusetts in the matter of Denise Crowe versus Robert Marchand, M.D. et al, United States District Court for the District of Rhode Island. C.A. number is 05-098T. Would the attorneys identify themselves for the record.

MR. TARRO: Thomas A. Tarro, III, attorney for the Plaintiff, Denise Crowe.



MR. GRIECO: Dennis Grieco, attorney for the Defendant, South County Orthopedics and Physical Therapy, Inc.

MR. CARROLL: David Carroll, attorney for Dr. Robert Marchand.

DIRECT EXAMINATION

(By Mr. Tarro)

Q Would you state your full name for the record, please.

A Bruce M. Leslie.

Q Good afternoon, Dr. Leslie. With regard to this deposition, you're here pursuant to a Notice of Deposition that we've marked as Exhibit Number One. I'm going to show you that notice and ask if you've had an opportunity to receive and review that document prior to today?

(Witness views document)

A Yes.

Q With regard to that Notice of Deposition, I requested that you bring to this deposition certain documents and records. Have you brought those with you?

A Yes.

Q I understand that with regard to the records that



you produced today, they do not include the original medical records sent to you by Attorney David Carroll, but you've had an opportunity to review a binder that we've marked as Exhibit Number Six at a prior deposition of Dr. Nalebuff and those are the same records that you reviewed in the context of this case?

A Yes, they are.

Q You also produced your Curriculum Vitae which we've marked as Exhibit Number Two, correct?

(Witness views document)

A Yes.

Q Exhibit Number Three, which I've marked, is a letter from Attorney David Carroll dated December 28, 2005. And it lists cases in which you've testified. Have you had an opportunity to review this document before?

A That's a document produced from bills that were generated from Quickbooks which I faxed to his office.

Q Do you have a list of cases with regard to the court, the case name, the docket number where you've testified over the past ten years at trial?

A I don't believe I've testified at trial for ten

45

Q Doctor, when did Dr. Marchand diagnose Denise Crowe with RSD?
A Well, let's see. Excuse me. I have a note here that says January 16, 2003, that was about three months after the fracture, Dr. Marchand re-evaluated Ms. Crowe and noted that she had significant RSD symptomatolgy.
Q Doctor, is there any type of diagnostic test that can be performed to determine if a patient has RSD?
MR. GRIECO: Objection.
A Not really.
Q So, there are no diagnostic tests that can be performed to determine a patient is in fact suffering from RSD, is that correct?
MR. CARROLL: Objection.
A I'm not certain where you're going with this, but the diagnosis of RSD is first and foremost a clinical diagnosis. There are other studies you can get to try and confirm it, but the sensitivity and specificity, meaning the accuracy of those tests are not great.
Q What are those diagnostic tests, Doctor?
A The most common one obtained is a three phase bone scan.

46

Q Is there any other diagnostic test?
A Possibly a response to a Stellate Ganglion block, but understand I am not recommending them as the way to make that diagnosis. It is a clinical diagnosis.
Q What symptoms are necessary for this clinical diagnosis?
A The key symptom is going to be a patient that's not following the usual expected course, be it after an operation, or in this case after an injury. So, when you have somebody with a Colles' fracture with or without a ligament tear, what you're going to start seeing in somebody who has an RSD, God forbid, is pain that's out of proportion. You expect pain to be diminishing over the first -- certainly by the second week. You expect the swelling to be going down. You expect finger motion to be improving.
If things are going the opposite way, in other words, pain is being maintained or, God forbid, increasing; if you're having swelling; if you're having redness; if you're having decreased finger motion. Sometimes you can get some bizarre sensations.

47

Later findings are going to be changes to the skin, the nails, the hair, posturing of the hand; protecting the hand. Initially the patient is not proceeding the way they're supposed to.
Q With regard to the medical records you reviewed on November 14, 2002, Dr. Marchand did not diagnose Denise Crowe with RSD, is that correct?
A No, he did not. What he did was in his brief note indicated that he was not going to do surgery for reasons that he did not document.
Q Isn't it a fact that on November 14th, he outlined to her a ligament reconstruction?
A I do not know if he did. All I know is that he discussed options with her. What options he discussed --
Q Could you look at the report of November 14, 2002.
(Witness views document)
A Yes, I have it in front of me, sir.
Q I'm sorry. Hold on one second. Do you see in the report where it says the option of reconstruction?
A You are correct, sir. What he says is the option of reconstructing the ligament; he did not say how he was going to reconstruct it, but he did discuss that.

48

Q What is your understanding, though, of the method in which you reconstruct a ligament?
MR. CARROLL: Objection.
MR. GRIECO: Objection.
A As I said earlier, there are a number of options. You can suture the ligament back together. You can suture the ligament and augment it, meaning that -- add additional tissue to it. You can not repair the ligament and just try and stabilize the bones. You can move tendons around or ligaments around to try and stabilize it. There are some people who actually put screws in to try and stabilize it. There are some people who do, as I referred to earlier, salvage surgery taking bones out or gluing bones together. We refer to that as salvage surgery because you're burning bridges there.
Q Do you have an understanding on November 14, 2002 that Dr. Marchand was considering surgery as an option?
A He clearly indicated that he was considering surgery and that he and the patient discounted it.
Q Where did you get the information that the patient discounted the surgery?
A The implication from the letter here -- from the

office note, where the doctor says I would favor conservative treatment and would continue to treat her with a splint. I have to assume that if she disagreed with that treatment, then he would have a, done something differently or b, she would have seen somebody else.

**Q There's no indication in the medical record of November 14th, that Denise Crowe indicated that she didn't want to have surgery, is that correct?**

A Well, since she didn't go anywhere else and since the doctor clearly stated he favored conservative treatment, I have to assume that she agreed with him.

MR. TARRO: You want to go off the record?

THE VIDEOGRAPHER: This is the end of tape one.

(Brief recess)

THE VIDEOGRAPHER: Back on the record, this is the beginning of tape number two.

(By Mr. Tarro)

**Q Doctor, has --**

MR. CARROLL: Excuse me one second. Are you hooked up to a mike.



MR. GRIECO: Mine is here. That's all I need for press purposes. You can hear me right Bill? I've never been accused of being soft spoken.

**Q I'd ask you to turn to the report of December 26, 2002, Doctor.**

**(Witness views document)**

A Yes, sir.

**Q In that report -- it's prepared by Rick Moffat who is a physician's assistant, correct?**

A Correct.

**Q He indicates, I'm a little concerned about a possible RSD. Do you have an understanding of what his concern was?**

A My understanding was the patient was not following the course after a wrist fracture with or without a ligament tear. And as a result, he was correctly questioning whether something else was going on that was making it worse.

**Q Where did you get that understanding from?**

A That he was concerned about an RSD?

**Q That it wasn't following the usual course.**

A The way they described her.

**Q Did you gather that information from any other**



**source other than the medical records?**

A No.

**Q It's an assumption that you're making that he was concerned that she wasn't improving and therefore was developing some sort of RSD like symptoms?**

A It's a fairly good assumption the way they're describing it.

**Q It that an assumption on your part?**

A Probably not, actually. The purpose of medical records is to convey a clinical picture. And when you look at the records here, on December 26th he saying that she has considerable pain. Two months after a fracture considerable pain, that's like a flashing neon light. Something's not right here. And then -- that's when, of course, when he said a little concerned about a possible RSD. And if you go before that time, November 22, 2002 the therapist noted significant pain that interfered with progress. December 3, 2002, therapist notes significant edema and she uses the words RSD or -- RSD.

**Q Doctor, are you making the assumption that these records of the physical therapist were reviewed by Dr. Marchand or do you know that for a fact?**



A I don't know that for a fact. All I can do is review the records. I can hope, but I do not know, that if the therapy is in the same facility and they happen to see each other, the therapist may go up to Rick Moffat and say, hey, by the way your patient here, we're having a little trouble with, or maybe went up to Dr. Marchand. Because to be honest, that's what most therapists do. They're very cautious about such things.

**Q Do you know if that happened in this particular case?**

A There is no documentation of that.

**Q So, you don't know?**

A That is correct.

**Q Now, Doctor, with regard to a fracture of the right distal radius, is it treated with therapy?**

MR. CARROLL: Objection.

MR. GRIECO: Objection.

A You mean after it's healed?

**Q Speaking of physical therapy, before or after it's healed.**

MR. CARROLL: Objection.

MR. GRIECO: Objection.

A Again -- Well as a general rule, you want the

61

gap on the x-ray and one bone will tilt dorsally, in other words, tilt to the back of the wrist. One will tilt volarly towards the front of the wrist. They're normally pointing straight ahead -- relatively straight ahead. So, they tilt in opposite directions. What happens is the ligaments around them will tighten up such that they maintain what's called a fixed deformity. Meaning the lunate is now tilted up permanently and the scaphoid is tilted down permanently. When that happens, it's almost impossible to do a soft tissue ligamentous repair because you can't get the bones back the way they want to be.

**Q There's no indication in the medical records that Denise Crowe had a fixed deformity, is there?**

A On the contrary, she had a mobile deformity.

**Q So, she did not have a fixed deformity?**

A That's correct.

**Q Doctor, what is chronic regional pain syndrome two?**

A It's -- RSD is a very confusing term and it's been broken down into two different varieties, CRPS -- CRPS I and CRPS II. One is a specific nerve injury, two is more vague in general is the easiest way to understand it.

62

**Q What is chronic regional pain syndrome two?**

A It's -- What it is is a patient who is having pain that's out of proportion to what you would expect to have. It can be associated with a number of physical findings, but does not have to be. The findings -- and we went over this earlier, have to do with joint stiffness; color changes, either too red or too white; cold sensitivity, increased hair growth; increased nail growth; swelling; stiffness; posturing of the -- of the extremity and eventually trophic changes where things become almost atrophied. In severe cases the patient just stops using the extremity or the digit or the arm completely.

**Q Is chronic regional pain syndrome two the same as RSD?**

A Some people say yes. Those people who are pain specialists try to make a big distinction because by definition, RSD in the traditional, old interpretation was a pain that responded to a Stellate Ganglion block, it's a type of nerve block. So, if somebody had a favorable response you would say they had an RSD. But you had a number of patients who you do the block and they'd still

63

have this severe pain and as a result they came up with the CRPS I and II.

MR. TARRO: I have no further questions at this time. I'm just going to reserve my right to reconvene based upon the additional information that. Two things, I'd ask for his file -- initial letter of retention and the documents that pertain to the case name.

MR. CARROLL: I'll see about -- I'm not sure you're entitled to the original letter of retention, but we can talk about that.

MR. TARRO: Well, it's requested. I believe I'm entitled to it under the federal rules and I would ask the doctor to produce it. If he has it at the office, I'd like it to be provided to me.

MR. CARROLL: I'll reserve the right to read and sign.

MR. GRIECO: I have no questions.

MR. TARRO: Thank you for your time, Doctor.

*

(Whereupon the deposition suspended at 2:20 p.m.)

64

CERTIFICATE

COMMONWEALTH OF MASSACHUSETTS
BRISTOL, ss.

I, Pauline L. Bailey, a Professional Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify:

That Bruce M. Leslie, M.D., the witness whose testimony is hereinbefore set forth, was duly sworn by me; that her testimony thereupon given was recorded by me and transcribed by me; and that such deposition is a true record of the testimony given by said witness, to the best of my knowledge, skill and ability.

IN WITNESS WHEREOF: I hereunto set my hand and notarial seal this 6th day of January, 2006.